### AFFIDAVIT IN SUPPORT OF APPLICATION FOR WARRANT

Your affiant, Gerald Adams, Border Patrol Agent of the United States Border Patrol, being duly sworn, does depose and state the following:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Border Patrol Agent with the United States Border Patrol ("USBP") permanently assigned to Douglas, Arizona and detailed to Tucson, Arizona with the Prosecutions Unit. I have been an agent with the USBP since January 22, 2018. I completed the USBP Academy in August 2018, where I received instruction in constitutional law, immigration law, criminal law, and federal and civil statutes. I have also received instruction in the detection, interdiction, and arrest of narcotics smugglers, alien smugglers, and aliens illegally present in the United States.

2. As a Border Patrol Agent, I work routine field agent duties patrolling the Douglas Area of Responsibility ("AOR"). I have been involved in many apprehensions of undocumented aliens, alien smugglers, narcotic traffickers, and facilitators. I have processed and presented many cases for criminal prosecution and administrative proceedings.

3. In February 2023, I was first assigned as a Case Agent for the Tucson Sector Prosecution Unit. I have conducted investigations involving illicit activity and have gathered and structured evidence and facts pertaining to administrative and criminal cases. I have taken sworn statements from material witnesses and suspects. I routinely perform record checks through various law enforcement databases to establish accuracy of information as well as to gather facts further relevant to a respective case. I have acted as a liaison between the United States Attorney's Office and field agents, and I have assisted fellow agents in the development of their cases.

4. Through my training and experience with Alien Smuggling Organizations ("ASOs"), I have learned that the utilization of cellular phones to communicate between coordinators, foot guides, load drivers, stash house operators, etc., is the most common form of communication. Cellular phones often contain evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text,

email, other electronic messaging applications, and voice mail communications between the person who possessed or used the device and others. It is quite common for navigational coordinates to also be transmitted to and/or from these devices to determine the user's location through a GPS application. In many areas of the border, scouts use cellular phones to guide the groups to the pickup locations. Drivers of scout vehicles can relay information to the driver of the load vehicle either with a direct call or with applications ("apps") such as WhatsApp. Scouts will relay information such as the presence of Border Patrol. Drivers can also be guided by "pin drops" on apps such as Google Maps which will contain directions for the load vehicle. ASOs will utilize several different apps and functions on their phones to facilitate the coordination of a smuggling event, all the way from inception of the alien to delivery of the alien at the desired location in the United States. In addition, the apps that ASOs use may vary from cellular phone to cellular phone.

5. Migrants, as well as human smugglers, commonly have in possession and use more than one phone while being smuggled or while smuggling. Reasons for this include one phone for use and to receive cellular reception in Mexico, and the other one is for use and cellular reception in the United States. Other times, both migrants and smugglers are given a phone from the smuggling organization for its use to guide migrants further into the United States illegally.

6. The statements contained in this affidavit are based on information provided by fellow Border Patrol Agents and on my experience as a Border Patrol Agent in the USBP. Since this affidavit is submitted for the limited purpose of securing a search warrant, I have not included all facts known to me regarding this investigation. I have set forth facts that establish probable cause to believe that the defendant referred to in this investigation conspired with known and unknown individuals to transport illegal aliens, in violation of 8 U.S.C. § 1324. This affidavit is intended to show only that there exists sufficient probable cause for the requested warrant and does not portray all my knowledge about this matter.

7. I submit this affidavit in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the contents of two (2) seized cellular devices, defined below as **Target Device 1 and Target Device 2,** alongside its respective number identifier (i.e. TD-1, TD-2, etc.) defined in Attachment A, and the extraction of

electronically stored information further described in Attachment B hereto.  **TDs** are collectively identified as the **Target Devices.**

## IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED

8. The cellular phone(s) to be examined are:

   i. White iPhone (TD-1) (PACKAGE A9076209)

   ii. Blue iPhone (TD-2) (PACKAGE A9076208)

The **Target Devices** were seized from the possession of Tiana Marie THOMAS during this event. The **Target Devices** are currently stored at the evidence vault maintained by Seized Property Specialists at Willcox, Arizona. They are to be searched pursuant to the attached Application are further described in Attachment A hereto.

9. The requested warrant would authorize the forensic examination of the **Target Devices** for the purpose of identifying electronically stored data to include: any telephone numbers, including but not limited to numbers called, numbers stored for speed dial, pager numbers, names and addresses, electronically stored voice, and text messages, calling card numbers, text messages, photos, videos and/or identifying information that may be stored in the memory of the **Target Devices**, as more fully described in Attachment B.

## PROBABLE CAUSE

10. On June 12, 2024, in the District of Arizona (Benson), at approximately 5:20 p.m., Border Patrol Agents (BPAs) received a Be on the Lookout (BOLO) notification for a silver Lexus IS bearing Arizona license plate SEXILXI that had traffic patterns consistent with human smuggling within the Brian A. Terry Border Patrol Station Area of Responsibility (AOR).

11. Transnational Criminal Organizations (TCOs), those who are attempting to enter the United States illegally, and those who are attempting to transport Undocumented Non- citizens (UNCs) further into the United States, exploit this area daily. Equally as important, TCOs and those who are attempting to transport UNCs further into the United States are well versed in routes of travel that will decrease the likelihood of encountering law enforcement.

12. The report also informed BPAs that the vehicle had just passed the closed immigration checkpoint located on State Route (SR) 90 northbound. BPAs began driving northbound and caught up to the vehicle near mile marker 291 on SR 90 and ran a registration check where they learned the vehicle was registered to Tiana Marie THOMAS with an address in Phoenix, Arizona.

13. As BPAs attempted to drive next to the vehicle to gain a better look into the passenger compartment, the driver, later identified as THOMAS, immediately and abruptly changed lanes in front of the BPA's vehicle multiple times, seemingly to keep the BPA from being able to come up next to the Lexus. BPAs eventually maneuvered next to the Lexus, and they observed a front seat passenger, wearing camouflage pants, and a passenger in the rear seats.

14. As the vehicle approached the Love's gas station located at the intersection of SR 90 and Interstate 10 (I-10), BPAs observed the driver move into the far-right lane, which allows motorists to enter the Love's gas station or turn onto I-10 eastbound, then quickly switch back to the far-left lane, dangerously crossing two lanes of traffic. Both vehicles stopped at a traffic light, and the BPA could see THOMAS talking on her phone and continually looking back at the BPA. At approximately 5:36 p.m., BPAs initiated a vehicle stop for an immigration inspection.

15. THOMAS yielded just north of the SR 90 and I-10 intersection. The BPA approached the vehicle and asked THOMAS to roll down the rear window to which she complied. The BPA then requested THOMAS to turn off the vehicle and hand over the keys to which she stated they keys were in her purse. She turned away from the agent and then reached in her purse and began manipulating something.

16. The BPA immediately asked THOMAS if she had any weapons on her, to which THOMAS stated she had a gun in her purse. THOMAS still had her hand in her purse, manipulating something. The BPA told her hand out the entire purse, and THOMAS complied.

17. An immigration inspection was conducted and the two passengers in the vehicle, Jasiel Garcia-Encarnacion and Santiago De Jesus-Ortiz, were determined to be citizens of Mexico, illegally present in the United States. Records checks revealed that Jasiel Garcia-Encarnacion and Santiago De Jesus-Ortiz do not possess the proper documentation to enter, pass through or remain in

the United States legally. The BPA instructed THOMAS to step out of the car. Initially, she refused but eventually complied.

18. The BPA secured THOMAS in the Border Patrol vehicle while waiting for a backup agent to arrive. A search of THOMAS's purse revealed a firearm, a magazine, and an unknown number of rounds. The BPA heard THOMAS's phone ring from where it had been placed on hood of her car. The BPA took THOMAS her identification at the Border Patrol vehicle and saw that she was on the phone with someone using her watch. Her phone showed the WhatsApp icon on its screen. The BPA took the watch from THOMAS.

19. Material witness Jasiel Garcia-Encarnacion stated he is a citizen of Mexico, and he didn't know how much he was going to pay to be smuggled into the United States. Garcia stated he illegally crossed into the United States with one other subject, and they walked through the desert until they reached a highway and started asking for a ride.

20. Garcia stated a grey car pulled over that was driven by a light skinned female with red hair. Garcia stated the driver did not speak Spanish and they used hand signals to ask her for a ride. Garcia stated the driver initially did not want to take them, but she agreed. Garcia stated the driver opened the doors and signaled him to sit in the front passenger seat. Garcia stated they drove for about 20 minutes before they were pulled over by Border Patrol.

21. Material witness Santiago De Jesus-Ortiz stated he is a citizen of Mexico, and he was going to pay 200,000 Mexican Pesos to be smuggled into the United States. De Jesus stated he illegally crossed into the United States with one other subject, and they were guided by cellphone until they reached a highway. De Jesus stated a grey car, driven by a female with red hair, was pulled over waiting for them.

22. De Jesus stated the driver made hand signals for them to get in and he sat in the back seats of the vehicle. De Jesus stated they drove for about an hour and a half before they were pulled over by Border Patrol.

23. After waiving her *Miranda* rights, THOMAS stated she picked up the two subjects because they were walking, and they looked hot. When asked why she had traveled down to Benson, Arizona from Phoenix, THOMAS said because she had never been to Benson before. It is important

to note that THOMAS's vehicle was over 20 miles south of Benson when first detected by technological sources and was headed north towards Benson.

24.     The **Target Devices** were seized from this event as evidence and are being stored by the Seized Property Specialists Willcox, Arizona.  The **Target Devices** have been stored in such a manner that their contents, to the best of my knowledge, are in substantially the same state as when they first came into possession of the United States Border Patrol

## TECHNICAL TERMS

25.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a) Wireless telephone: A wireless telephone (or mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b) Digital camera: A digital camera is a camera that records pictures and video as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for

6

viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos. Most cell phones currently manufactured contain digital cameras as a standard feature.

c) <u>Portable media player</u>: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games. Most cell phones currently manufactured contain portable medial players as a standard feature.

d) <u>Internet</u>: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the Internet as a standard feature. Further, most current cell phones allow the user to transmit electronic messages via standard email services or specially designed communication applications between parties.

19. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voice mail communications between the person who possessed or used the device and others. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application. In many areas of the border scouts use phones to guide the groups to the pickup locations. This allows the

guides to maintain a safe distance and insulate themselves from the group and thus evade apprehension.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26. Based on my knowledge, training, and experience, I know that electronic devices such as the **Target Devices** in this case, can store information for long periods of time. Similarly, things that have been viewed via or uploaded to the Internet are typically stored for some period of time on the device. Additionally, computer files or remnants of such files can be recovered even if they have been deleted. This is because when a person "deletes" the information on an electronic device, the data does not actually disappear, rather, the data remains on the storage medium until it is overwritten by new data. Information described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

27. As further described in this affidavit and Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Devices** were used, where they were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the **Target Devices** as more fully set forth in the factual section contained herein and because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file, including frequency channels, text messages, video, or photographs.

    b. Forensic evidence on a device can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity of how an electronic device works may, after examining the forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic

evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant. Further, in finding evidence of how a device was used, the purpose of its use, who used it, when and where, sometimes it is necessary to establish that a particular thing is not present on a storage medium, for example, the absence of the entry of a name in a contact list as evidence that the user(s) of device did not have a relationship with the party.

## CONCLUSION

28. Based on the foregoing information, I submit that there is probable cause to for a search warrant authorizing the examination of the **Target Devices** described in Attachment A to seek the items described in Attachment B. I believe that the Target Phone contains evidence relating to the commission of a criminal offense, which is violations of 8 U.S.C. § 1324, as well as constitutes property designed for use, intended for use, or used in committing the aforementioned crime. The examination of the **Target Devices** may require authorities to employ techniques, including, but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. Because this warrant only seeks permission to examine devices already in the possession of the Border Patrol, the execution of this warrant does not involve the physical intrusion onto premises.

\ \ \

Consequently, there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

*GERALD B ADAMS*
Digitally signed by GERALD B ADAMS
Date: 2024.06.20 08:49:06 -07'00'

Gerald Adams, Border Patrol Agent
United States Border Patrol

Subscribed to electronically and sworn to telephonically before me this __20th__ day of June 2024.

*Maria S. Aguilera*
Honorable Maria S. Aguilera
United States Magistrate Judge